**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **ALLEXINE M. WARREN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No. 12 C 3298** |
| v. ) | |
| ) | **Magistrate Judge Daniel G. Martin** |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Allexine M. Warren (Warren) seeks judicial review of the final decision of the Commissioner of Social Security denying her application for disability insurance benefits (DIB) and supplemental security income (SSI). The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the following reasons, the ALJ's denial of benefits is reversed and this case is remanded for further proceedings consistent with this opinion.

**I.   Background**

Warren was born on September 1, 1960. (R. 139, 143). Warren completed high school and has worked as a data entry clerk and general office clerk. (R. 33, 45). Warren applied for DIB and SSI on October 27, 2008, alleging she became totally disabled on July 25, 2008 due to the after-effects of a stroke she suffered in June 2008, trouble reading and comprehending, inability to focus and sleep, and depression. (R. 56, 139-45). Warren's application was denied at the initial and reconsideration levels. (R. 51-57).

Under the well-known five-step sequential analysis used to evaluate disability, ALJ Sherry Thompson found that Warren had not engaged in substantial gainful activity since her alleged onset date of July 25, 2008 (step one); her affective disorder and generalized anxiety disorder were severe impairments (step two); but that they did not qualify as a listed impairment (step three).  (R.

17). The ALJ determined that Warren retained the residual functional capacity (RFC) to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant possesses the cognitive, attentional, and functional abilities to perform simple, routine activities; she can sustain focus and attention for at least two-hour intervals at a time; she can work at a normal pace; and she should have brief superficial contact with others. (R. 19). Given this RFC, the ALJ concluded that Warren was unable to perform her past relevant work as a data entry clerk or general office clerk (step four). (R. 21). The ALJ concluded there were jobs that exist in significant numbers in the economy that Warren could perform considering her age, education, and residual functional capacity, including housekeeper, mail room clerk, and machine feeder. (step five). (R. 22). The Appeals Council denied Warren's request for review on March 13, 2012. (R. 1-4). Warren now seeks judicial review of the final decision of the Commissioner, which is the ALJ's ruling. O'Connor-Spinner v. Astrue, 627 F.3d 614, 618 (7th Cir. 2010).

## II. Discussion

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled within the meaning of the Act, the ALJ conducts a five-step sequential inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, see 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform her former occupation; and (5) whether the claimant is unable to perform any other available work in light of her age, education, and work experience. 20 C.F.R. § 404.1520(a) (2004); Clifford v. Apfel, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to

the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." Clifford, 227 F.3d at 868 (quoting Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence, based upon a legal error, or too poorly articulated to permit meaningful review. Hopgood ex rel. v. L.G. v. Astrue, 578 F.3d 696, 698 (7th Cir. 2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). In its substantial evidence review, the court critically reviews the entire administrative record but does not reweigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its own judgment for that of the Commissioner. Clifford, 227 F.3d at 869. An ALJ's credibility determination is generally entitled to deference and will not be overturned unless it is patently wrong. Schaaf v. Astrue, 602 F.3d 869, 875 (7th Cir. 2010).

In this case, the ALJ denied Warren's claim at step five, finding that Warren retains the residual functional capacity to perform a full range of work at all exertional levels but with certain nonexertional limitations. Warren raises three main challenges to the ALJ's denial of benefits: (1) the ALJ improperly assessed Warren's residual functional capacity; (2) the ALJ's adverse credibility determination is patently wrong; and (3) the ALJ gave too much weight to the medical opinions of a consultative psychologist and non-examining state agency psychologist who did not review subsequent psychiatric treatment records. Because the RFC assessment and credibility determination are not based on substantial evidence, the ALJ's decision must be reversed and the case remanded to the Commissioner for further administrative proceedings.

### A. RFC Determination

Warren argues that the ALJ failed to adequately account for her moderate limitations of concentration, persistence, or pace when she determined Warren's RFC. A claimant's RFC is "the most [the claimant] can do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). "Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00 C(3). Generally, an ALJ cannot account for limitations in concentration, persistence, and pace by restricting a claimant to simple, routine, repetitive tasks. Walters v. Astrue, 2011 WL 5024149, at *5 (7th Cir., October 21, 2011) (holding that an RFC assessment which limited the plaintiff to "routine, repetitive tasks with simple instructions" did not sufficiently account for limitations in concentration); Stewart v. Astrue, 561 F.3d 679, 684-85 (7th Cir. 2010) (holding the ALJ cannot account for "limitations of concentration, persistence, and pace by restricting the inquiry to simple, routine tasks that do not require constant interactions with coworkers or the general public."). The Seventh Circuit has also held, however, that when a medical expert translates his findings concerning a claimant's deficits in concentration, persistence, or pace into a specific RFC assessment, the ALJ may reasonably rely on that opinion in determining the claimant's RFC and in formulating a hypothetical question for the VE. Milliken v. Astrue, 397 Fed.Appx. 218, 221-22 (7th Cir. 2010); Johansen v. Barnhart, 314 F.3d 283, 289 (7th Cir. 2002).

Warren challenges the ALJ's attempt to accommodate her moderate limitations in concentration, persistence, or pace by limiting her to simple, routine activities requiring focus and attention for at least two-hour intervals, work at a normal pace, and brief superficial contact with others. During her step three listing analysis, the ALJ found Warren to be moderately limited with regard to concentration, persistence, or pace. (R. 18). In her RFC discussion, the ALJ noted that

she accommodated Warren's mental impairments by limiting Warren to simple, routine activities; work that requires sustained focus and attention for at least two-hour intervals at a time; and work which allows only brief, superficial contact with others. (R. 20). The ALJ concluded that Warren retained the "cognitive, attentional, and functional abilities to perform simple routine activities; she can sustain focus and attention for at least two-hour intervals at a time; she can work at a normal pace, and should have brief superficial contact with others." (R. 19).

In formulating this RFC, the ALJ accorded "great weight" to the opinion of Dr. Henson and stated she "considered his specific findings in limiting the residual functional capacity." (R. 20). On August 21, 2009, state agency psychologist Dr. Donald Henson reviewed the evidence in Warren's file and concluded that she suffered from an adjustment disorder, with moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining, concentration, persistence or pace. (R. 325, 332). Dr. Henson then determined that Warren was "not significantly limited" in fifteen of twenty work-related areas of mental functioning. (R. 336-37). Dr. Henson also determined that Warren was "moderately limited" in the remaining five areas: (1) the ability to carry out detailed instructions; (2) the ability to maintain attention and concentration for extended periods; (3) the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (4) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number and length of rest periods; and (5) the ability to interact appropriately with the general public. (R. 336-37). Dr. Henson translated his worksheet observations into an assessment of Warren's mental RFC, concluding that Warren could perform "simple routine activities which are within the limits of her physical capabilities and have few social demands." (R. 338).

The ALJ also placed "great weight" on Dr. Alan Long's psychological consultative evaluation on May 1, 2009. (R. 20; 315-17). Dr. Long spent forty minutes evaluating Warren. (R. 315). Dr. Long noted that Warren "has had problems with her relationships at work and with family members" and "is tired all the time." (R. 316). Dr. Long concluded that "[it] is not clear that [Warren's] emotional symptoms are related to the stroke." Id. Dr. Long diagnosed Warren with adjustment disorder with mixed disturbance of emotion and conduct. Id. Dr. Long did not translate his findings into a specific RFC assessment.

Although the ALJ purported to rely on Dr. Hensen's opinion, this case is not analogous to the line of cases which hold than an ALJ may reasonably rely on a medical expert's opinion which effectively translated a claimant's mental limitations into an RFC assessment. Milliken, 397 Fed.Appx. at 221-22; Johansen, 314 F.3d at 289. Here, like the state agency consulting physician in Johansen, Dr. Henson "translated [his] findings into a specific RFC assessment." Johansen, 314 F.3d at 289. Dr. Henson completed a mental residual functional capacity assessment of Warren and translated his findings of Warren's limitations into a specific RFC, concluding that despite her moderate difficulties maintaining concentration, persistence, or pace, Warren could perform "simple routine activities which are within the limits of her physical capabilities and have few social demands." (R. 338). The ALJ stated that she gave "great weight" to Dr. Henson's opinion and "considered his specific findings in limiting the residual functional capacity." (R. 20). The fundamental problem is that the ALJ's RFC determination did not fully correspond with Dr. Henson's specific mental RFC assessment. The ALJ incorporated all of the restrictions contained in Dr. Henson's conclusion ("simple routine activities" and "brief superficial contact with others") but also added that Warren "can sustain focus and attention for at least two-hour intervals at a time" and "can work at a normal pace." (R. 19).

The record lacks medical evidence to support the ALJ's RFC finding that Warren has the ability to maintain focus and attention for at least two-hour intervals. No physician opined that Warren is capable of concentrating a certain number of hours at a time, and the ALJ did not explain what medical records supported her finding of a two-hour attention span. Barrett v. Barnhart, 355 F.3d 1065, 1068 (7th Cir. 2004) (finding ALJ erred because the court did "not know on what basis he decided [the claimant] can stand for two hours at a time" and "[n]o physician said that."). Dr. Henson determined that Warren was moderately limited in her "ability to maintain attention and concentration for extended periods," but no physician translated that medical determination into an ability to sustain focus and attention for at least two-hour intervals. (R. 336).

The Commissioner asserts that the ALJ's finding that Warren could sustain focus and attention for at least two-hour intervals at a time is supported by her own statements in July and August of 2008 that she felt she was ready to return to work following her stroke on June 27, 2008 and her doctor authorizing her to return to work in July 2008. (R. 292, 294, 295). The Commissioner also relies on a consultative examination on January 15, 2009, at which time Warren had no specific complaints other than becoming easily fatigued and her mental status examination was normal. (R. 303, 304). The ALJ's finding cannot be upheld on this basis because the ALJ never articulated these reasons nor relied on the evidence the Commissioner cites to support her finding that Warren could sustain focus and attention for at least two-hour intervals at a time. Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003) (explaining "general principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").

Also, substantial evidence conflicts with the ALJ's finding that Warren can work at a normal pace. As to pace of work, Dr. Henson, upon whom the ALJ allegedly relied, opined that Warren was moderately limited in her ability "to perform at a consistent pace without an unreasonable number and length of rest periods." (R. 337). The ALJ did not explain her disregard of this

pertinent evidence which was inconsistent with her determination that Warren could sustain a normal pace of work. Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995) (stating the ALJ "may not select and discuss only that evidence that favors his ultimate conclusion."); Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004) (noting the ALJ "must confront the evidence that does not support his conclusion and explain why it was rejected."). By finding that Warren can sustain focus and attention for two hours and work at a normal pace, the ALJ improperly played doctor and formulated her own independent medical opinion regarding the effects (or lack of effects) of Warren's moderate difficulties of concentration, persistence or pace. Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996) (noting that "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

The ALJ's incorporation of a two-hour attention span and normal work pace into her RFC determination cannot be found harmless. None of the physicians of record stated that Warren was capable of sustaining focus and attention for at least two-hour intervals at a time and working at a normal pace. The VE testified that an individual who was off task more than 15% of the workday due to limitations in concentration could not perform the identified housekeeping and mailroom clerk jobs. (R. 47). The VE also testified that being off task or losing concentration could not be tolerated for more than ten percent of an eight-hour workday for the machine feeder job. Id. There is no basis in the record to determine how Warren's moderate limitations in maintaining concentration, persistence, or pace translate into an amount of off task time at work when performing "simple routine activities" which "have few social demands." (R. 338). In light of the VE's testimony, on remand the ALJ shall take additional evidence to determine how moderate limitations in concentration, persistence, or pace translate into an amount of off task time at work when performing "simple routine activities" which "have few social demands."

In a related point, Warren argues that an ability to maintain focus and attention for at least two-hour intervals at a time is actually no limitation at all. The record in this case contains no

evidence concerning the frequency of normal breaks, but the Commissioner has in another recent case indicated that normal breaks occur every two hours during a regular 8-hour workday. Braithwaite v. Commissioner of Social Security, 2011 WL 1253395, at *5 n.4 (E.D. Cal. March 31, 2011). Dr. Henson found that Warren is moderately limited in her "ability to maintain attention and concentration for extended periods." (R. 336). It does not seem to make sense to conclude, as the ALJ apparently did here, that an individual with moderate limitations in the ability to maintain attention and concentration would require the same frequency of breaks as a typical worker. Because this case must be remanded for other reasons, the ALJ should address this issue on remand as well.

Warren next argues that the ALJ's RFC finding is not supported by substantial evidence because it did not incorporate Warren's need to miss days of work. In response to a question by Warren's own attorney, the VE testified that there were no unskilled jobs available for a person who missed work more than one time per month. (R. 49). A finding that Warren would miss more than one day per month at the unskilled jobs listed by the VE would therefore be above the maximum absenteeism rate employers will tolerate. Dr. Henson, on whom the ALJ expressly relied, found that Warren was moderately limited in her ability to "maintain regular attendance" and "complete a normal . . . workweek without interruptions from psychologically based symptoms." (R. 336-37). There is no evidence in the record regarding the number of days per month that Warren would miss work in light of her limitations. The ALJ implicitly concluded that Warren would not miss more than one day per month but failed to explain how this conclusion was consistent with Dr. Henson's opinion. In light of the VE's testimony, a remand is necessary on this issue in order to "build a logical bridge" between the evidence and the ALJ's conclusion. On remand, the ALJ shall take additional evidence to determine how Warren's moderate limitations in maintaining regular attendance and completing a normal workweek without interruptions from psychologically based symptoms translate into the number of work days Warren would miss per month.

Finally, concerning her RFC, Warren faults the ALJ for not discussing or accommodating her fatigue and need to lie down during the work day. This argument is related to Warren's argument that the ALJ erred in evaluating her credibility by failing to account for the tiredness and fatigue side effects of her medications. Because the issues are intertwined, the Court addresses these two arguments together in its subsequent discussion of the ALJ's credibility determination.

B.    **Credibility Determination**

In addition to the insufficient RFC finding, Warren argues that the ALJ's assessment of her credibility is flawed. "The ALJ's credibility determinations are entitled to special deference but the ALJ is still required to 'build an accurate and logical bridge between the evidence and the result.'" Castile v. Astrue, 617 F.3d 923, 929 (7th Cir. 2010). In evaluating a claimant's credibility, the ALJ must comply with SSR 96-7p and articulate the reasons for the credibility determination. Brindisi v. Barnhart, 315 F.3d 783, 787 (7th Cir. 2003). ALJs must evaluate the credibility of the claimant's testimony about her symptoms in light of seven factors: (1) daily activities, (2) the location, duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) the type, dosage, effectiveness, and side effects of medication, (5) treatment, (6) other measures used to relieve the pain, and (7) other factors concerning functional limitations. SSR 96-7p, at *3. SSR 96-7p provides that the ALJ's credibility determination must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, at *4. The ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." Id. It is not sufficient for an ALJ to "make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" Id.

The ALJ's credibility assessment in this case began by using the "meaningless boilerplate" which the Seventh Circuit has repeatedly criticized when she concluded that Warren's "statements

concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 20); Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012); Parker v. Astrue, 597 F.3d 920, 921-22 (7th Cir. 2012). "But the boilerplate itself is not fatal if the ALJ supports her finding with additional reasons" supported by substantial evidence. Dornseif v. Astrue, 2013 WL 150121, at *2 (7th Cir. 2013); Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012). The ALJ then questioned Waren's alleged physical limitations given the lack of evidence supporting them in the record. (R. 20). The ALJ also considered some of the medical evidence with regard to Warren's alleged limitations due to her mental impairments, including the consultative psychological evaluation by Dr. Alan Long, Ph.D. and the psychiatric progress notes from October 2009 through September 2010. Id.

Warren contends that the ALJ erred because she did not discuss Warren's daily activities in determining her credibility. Warren acknowledges, however, that the ALJ discussed Warren's daily activities at step three in determining that she had moderate restrictions in activities of daily living. (R. 18). At step three, the ALJ considered the evidence Warren presented to show she suffered from limitations in the area of activities of daily living. Specifically, the ALJ considered Warren's testimony that she needs assistance to carry out her daily activities and that her daughter's father moved back in with her to help both her and their daughter. (R. 18). The ALJ also considered a written report completed by Warren in which she indicated that her personal care takes longer than before but she can still do most of it on her own and that her mother helps her care for her eight-year-old daughter. Id. The ALJ noted that Dr. Henson opined that Warren was moderately limited in her activities of daily living. Id. Based on these facts and Dr. Warren's opinion, the ALJ concluded that Warren has a moderate restriction in activities of daily living. Id. The fact that the ALJ's consideration of Warren's activities of daily living is woven into her analysis at step three, rather than a discussion limited to credibility, is insignificant. Rice v. Barnhart, 384 F.3d 363, 370 n.5 (7th Cir. 2004) (explaining "[b]ecause it is proper to read the ALJ's decision as

a whole, and because it would be a needless formality to have the ALJ repeat substantially similar factual analyses [in multiple steps], we consider the ALJ's treatment of the record evidence in support of both his conclusions at [multiple steps].") The ALJ provided an adequate explanation for her finding that Warren has a moderate restriction in activities of daily living, and Warren points to no specific evidence that the ALJ did not consider and address regarding her daily activities. The ALJ provided sufficient support and explanation on the issue of Warren's activities of daily living.

As an additional challenge to the ALJ's credibility finding, Warren argues that the ALJ failed to explain how she considered the side effects of Warren's medications when assessing credibility. Warren's argument on this point is well-taken. SSR 96-7p provides that in evaluating the credibility of a claimant's subjective complaints, the ALJ must consider, among other factors, the side effects of any medication the individual takes or has taken to alleviate pain or other symptoms. When asked whether she experienced side effects from her medications, Warren testified that she experienced dizziness, fatigue, tiredness, aches and pains in her shoulder, and nausea but did not know if the medications caused the symptoms. (R. 35-36). Warren testified that she sometimes experiences fatigue all day. (R. 36). On a typical day, Warren stated she spends half the day or twelve hours lying in bed on and off. (R. 41).

In her decision, the ALJ only briefly addressed Warren's alleged medication side effects as follows: "The claimant testified that she believes that she is disabled because her medications always make her dizzy and tired, and that she would not be able to handle a work environment." (R. 20). The ALJ acknowledged Warren's allegation that she is "extremely fatigued" and her testimony that she has to lay down for at least a half an hour after doing anything. (R.19-20). The VE testified that no jobs are available for an individual who needs to lie down outside of normal breaks or a lunch period. (R. 48-49). The ALJ did not engage in any independent analysis or discussion as to why Warren's alleged fatigue and need to lie down during the day lacked

credibility.

The ALJ's credibility determination is inadequate because it lacks any explanation or support for apparently rejecting Warren's statements about the medication side effect of fatigue and her need to lie down during the day. SSR 96-7 p requires an ALJ to specify the reasons for her credibility determination "so that the applicant and subsequent reviewers will have a fair sense of the wight given to the applicant's testimony." Golembiewski, 322 F.3d at 916 (stating "nothing in Social Security Rule 96-7p suggests that the reasons for a credibility finding may be implied."). If the ALJ believed Warren's testimony regarding the side effect of fatigue to be incredible or that the alleged medication side effects were not severe enough to prevent Warren from working, the ALJ need to e578xplain why.

The Commissioner argues that the actual record shows that Warren did not complain to any doctor of the side effects she alleges. The Commissioner also defends the ALJ's decision by arguing that a need to lie down during the work day and extreme fatigue is not supported by the record, citing Warren's statements to her doctor in July and August 2008 that she was ready to return to work and Dr. Burr's psychiatric treatment notes. (Doc. 34 at 7). Judicial review is confined to the reasons supplied by the ALJ, and the ALJ did not articulate these reasons when she apparently rejected Warren's testimony regarding medication side effects and her need to lie down during the work day. Golembiewski, 322 F.3d at 916. In any event, the Seventh Circuit has expressed skepticism that "a claimant's failure to identify side effects undermines her credibility–after all . . . some patients may not complain because the benefits of a particular drug outweigh its side effects." Terry v. Astrue, 580 F.3d 471, 477 (7th Cir. 2009). On remand, the ALJ must specifically articulate her reasons for believing or not believing Warren's testimony as to the fatigue side effect of her medications and her need to lie down during the work day.

Another reason offered by the ALJ for discrediting Warren's testimony is not supported by substantial evidence. The ALJ placed considerable weight on the fact that Warren "did not attribute

her firing [from her last job at Ford] to any functional limitations due to her stroke or any mental conditions." (R. 20); see also (R. 21) (stating Warren "was fired from Ford and at the consultative exam she noted that it was not related to functional limitations due to the stroke or emotional issues."). The fact that a claimant left a job for reasons other than her medical condition is a proper consideration in assessing credibility, Medhaug v. Astrue 578 F.3d 805, 816-17 (8th Cir. 2009), but the record does not indicate Warren was fired from her last job due to reasons unrelated to her medical condition. Warren told Dr. Long that she "worked on the Ford Assembly line, they fired me after I had a stroke because I was off of work for two weeks. I wanted my job back. I was only there for three months." (R. 315). Warren added: "I don't know why Ford thought I couldn't do the job. I think I could do the job." (R. 316). Dr. Long concluded that "Warren seems motivated to work and angry she cannot return to Ford. She attributes most of her problems, to some extent, to losing her job at Ford which she enjoyed." (R. 317). At the hearing, Warren explained that she was fired from Ford for absenteeism caused by her stroke: "I had just started working at Ford, and I had a stroke about a month later. Since I was in the hospital for a couple of weeks, they fired me while I was in the hospital, because they say I haven't been there long enough." (R. 34).

The ALJ's interpretation of this evidence to discredit Warren's allegations and conclude that she stopped working for reasons not related to a medical condition is not supported by substantial evidence. The evidence indicates that Warren stopped working because she was fired from Ford following a two-week absence due to a medical condition (her stroke). The ALJ did not explain how that fact is inconsistent with Warren's disability claim or undermined the credibility of her alleged symptoms. The ALJ also noted Dr. Long concluded that Warren "attributes most of her problems, to some extent, to losing her job at Ford which she enjoyed. She does not attribute her problems to a stroke or a mental condition." (R. 21, 317). The exact cause of Warren's emotional symptoms is irrelevant to an analysis of whether Warren retains the ability to work. Further, the fact that Warren wanted to return to work at Ford and struggles with being unable to do so should not be

viewed as a negative credibility factor because a desire to work does not necessarily imply an ability to work. Ison v. Astrue, 2012 WL 832983, at *9 (N.D. Ill. March 12, 2012).

### C. Dr. Balin Durr's Psychiatric Treatment Records

Warren advances one final argument. Warren contests the ALJ's heavy reliance on Dr. Long's psychological consultative examination completed May 1, 2009 and Dr. Henson's mental RFC assessment completed August 1, 2009, arguing that they did not have the benefit of subsequent psychiatric treatment notes by Dr. Balin Burr from October 13, 2009 through October 7, 2010. (R. 344-61). The ALJ accorded "great weight" to the opinion of Dr. Henson, the non-examining psychological consultant. Dr. Henson concluded that Warren could perform simple, routine activities which have few social demands, and the ALJ found this opinion "consistent with the medical evidence of record." (R. 20). The ALJ stated that she considered Dr. Henson's "specific findings in limiting the residual functional capacity." Id. The ALJ also gave "great weight" to the evaluation by examining psychologist Alan Long, Ph.D who the ALJ stated "reviewed all the evidence of record." Id. In his report, however, Dr. Long indicated that the only information he received was an Adult Progress Noted dated 2/11/09 stating from an unknown source that "[t]he applicant was feeling very fatigued and does not want to do anything" and including "an allegation of stroke, trouble reading and comprehending, no focus, cannot sleep and depressed." (R. 315). Dr. Long stated that "[t]here was no other information sent with this referral." Id.

The applicable regulations provide that, when evaluating a nonexamining source's opinion, the ALJ "evaluate[s] the degree to which these opinions consider all of the pertinent evidence in [the] claim, including the opinions of treating and other examining sources." 20 C.F.R. §§ 404.1527(c)(3); 416.927(c)(3). As to the opinions of consulting examiners, an ALJ should consider "the extent to which an acceptable medical source is familiar with the other information in [the claimant's] case record . . . in deciding the weight to give a medical opinion." 20 C.F.R. §§

404.1527(c)(6); 416.927(c)(6).  Since Dr. Long's evaluation was completed on May 1, 2009 and Dr. Henson's assessment was rendered on August 1, 2009, they did not have the benefit of Dr. Burr's psychiatric treatment notes, which contain a diagnosis of bipolar affective disorder as well as generalized anxiety disorder, describe ongoing symptoms, and list several prescribed medications.  The Commissioner argues that Dr. Durr's subsequent psychiatric treatment records do not conflict with the findings of Dr. Henson or Dr. Long, but this reason was not given by the ALJ when she credited the opinions of Drs. Henson and Long.  Golembiewski, 322 F.3d at 916.  The Court cannot say with confidence that the more recent evidence from Warren's treating psychiatrist would not have affected the opinions of the psychological consultants.  Because a remand is necessary for a reasoned evaluation of Warren's RFC and credibility, the ALJ shall on remand obtain an updated opinion from a medical expert which accounts for Dr. Burr's treatment notes.

### III. Conclusion

For these reasons, the decision of the ALJ is reversed and this case is remanded to the Social Security Administration pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.  The Clerk is directed to enter judgment in favor of Plaintiff Allexine M. Warren and against Defendant Commissioner of Social Security.

**E N T E R:**

*Daniel G. Martin* (signature)

**Daniel G. Martin**
**United States Magistrate Judge**

Dated:  March 22, 2013